UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                         :
MARITZA ARVELO                           :        3:13 CV 592 (JGM)
                                         :
V.                                       :
                                         :
CAROLYN W. COLVIN,                       :
ACTING COMMISSIONER OF                   :
SOCIAL SECURITY                          :
                                         :        DATE: DECEMBER 1, 2014
------------------------------------------------------ x
```

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"].

## I.  ADMINISTRATIVE PROCEEDINGS

On April 9, 2010, plaintiff Maritza Arvelo applied for DIB claiming that she has been disabled since February 19, 2010, due to neuorpathy, depression, carpal tunnel, hip pain, and osteoarthritis. (Certified Transcript of Administrative Proceedings, dated June 14, 2013 ["Tr."] 105, 181-87). Plaintiff's application was denied initially and upon reconsideration. (Tr. 117-21, 126-29; <u>see also</u> Tr. 93-116, 125).  On March 1, 2011, plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"](Tr. 129), and on November 8, 2011, a hearing was held before ALJ Amita B. Tracy, at which plaintiff and a vocational expert testified.  (Tr. 35-92; <u>see also</u> Tr. 130-77).  Plaintiff was represented by counsel at the administrative level and on this appeal.  (Tr. 122-24, 178-80).  On December 22, 2011, ALJ Tracy issued her decision finding that plaintiff had

not been under a disability from February 19, 2010 through the date of her decision.  (Tr. 14-29). Plaintiff filed a request for review of the hearing decision (Tr. 12-13; <u>see also</u> Tr. 7-8), and on February 20, 2013, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).

On April 24, 2013, plaintiff filed her complaint in this pending action.  (Dkt. #1).[1]  On July 18, 2013, defendant filed her answer, along with a copy of the certified administrative record, dated June 14, 2013.  (Dkt. #12).[2]  On April 21, 2014, plaintiff filed her Motion to Reverse the Decision of the Commissioner, or in the alternative, Motion to Remand for a Rehearing, with brief in support.  (Dkt. #19; <u>see also</u> Dkts. ##14-18).  On June 18, 2014, defendant filed her Motion to Affirm the Decision of the Commissioner, with brief in support.  (Dkt. #20).  Plaintiff filed her reply brief on August 7, 2014.  (Dkt. #23; <u>see also</u> Dkts. ##21-22).

For the reasons stated below, plaintiff's Motion to Reverse, or in the alternative, to Remand (Dkt. #19) is <u>denied</u>, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #20) is <u>granted</u>.

## II. FACTUAL BACKGROUND

### A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

Plaintiff was born in 1965, and is forty-nine years old.  (Tr. 181).  Plaintiff completed a GED, became a certified nurse assistant ["CNA"], and last worked as a medical assistant at a urologist's office.  (Tr. 45-46, 240).  She is now divorced and has two daughters.  (Tr. 43-44, 231).[3]

---

[1]Plaintiff also filed a Motion to Proceed <u>in Forma Pauperis</u> (Dkt. #2), which motion was granted two days later.  (Dkt. #6).

[2]The administrative record is 956 pages long.

[3]As a result of plaintiff's divorce, many of her medical records are under her married name, Maritza Avila.  (<u>See</u> Tr. 40, 41-43 (explaining name change); <u>see also</u> Tr. 17).

Plaintiff testified that she stopped working in February 2010, "[b]ecause [her] pain got real bad . . . ."  (Tr. 46-47).  She indicated that one of the reasons for her being unable to work is that her Fentanyl patches "make [her] groggy and sleepy . . . and then the Neurontin, [she] can't - - sometimes it makes [her] dizzy, [she] can't focus."  (Tr. 57-58).  Plaintiff testified that subsequent to February 2010, her pain was too strong for her to work, and that after having surgery in October 2010 she felt better until her pain returned "about two months post-surgery."  (Tr. 58-59).  Plaintiff testified that she wears splints for her carpal tunnel syndrome, wears a knee brace for her right knee, and was supposed to be using crutches at the time of the hearing, but does not use the left crutch because it triggers her pain.  (Tr. 63-64, 237).  Plaintiff described her pain as follows:

> It's in [her] shoulder, goes to [her] chest, down [her] left arm and up to [her] clavicle and on [her] left jaw. [Her] hands, they hurt, [her] wrists have lost a lot of like strength. [She] can't carry anything heavy.  Even when [she] tr[ies] to do daily chores, it bothers [her], [she] can't do them like before. [Her] right knee hurts a lot.

(Tr. 66).  Plaintiff, describing the pain in her shoulders, indicated that "it's like shocking like if someone puts wires - - stick[s] [her] with wires and then electrical shock.  Sometimes it's throbbing, it radiates."  (Tr. 67).   As to her knee, she stated that "[i]t's very painful[,]" and occurs "[o]ff and on[]" every day."  (Tr. 67-68).  She represented that she could not sit or stand for more than an hour at a time, and that after walking for four or five blocks her knee would begin hurting her.  (Tr. 68).  She testified that she has "to take long hot baths for some relief of hip pain, knee pain, [and] leg pain plus lower back pain."  (Tr. 232).  Plaintiff also testified that she has pelvic pain that she treats with a heating pad.  (Tr. 79).

Plaintiff testified that she cannot lift or carry more than five pounds, and that she has problems using her hands, saying, "when [she] tr[ies] to open jars, like a mayonnaise bottle [or] something, [she] can't turn it.  It's hard for [her] to open it."  (Tr. 69-70).  She added that "when [she is] holding a book, [she] can't hold it like this. [She] ha[s] to like put [her] hand under it,

because [she] can't do the pinching, because [her] hand hurts." (Tr. 71). She noted that she cannot do some chores around the house, because "[i]t hurts [her] hands (& wrists) to pinch, carry, pull." (Tr. 234). Plaintiff also indicated issues with eating, explaining that she has "to put down [the] fork or spoon [be]cause [her] thumbs hurt when [she] pinch[e]s [the] utensil." (Tr. 232). She also pointed out problems cooking, indicating that "[she] can't stir things for long. It's hard to hold heavy pots, pans." (Tr. 233). Due to problems with her hands, plaintiff added that her daughter has to fold the clothes for her because of her hand pain, and that when doing chores, she needs to "stop a lot to rest [her] hands." (Tr. 234; see also Tr. 73). She also testified at the hearing that "when [she is] sweeping, [she] can't complete the whole thing, because since [she is] using both arms, [she] can get pain on [her] left side." (Tr. 73). In addition, she has problems with writing, testifying that "[w]hen [she is] writing, [she] can't write too long, because [her] hand hurts - - [her] wrist starts hurting [her] and [she] can't grasp the pen real tight." (Tr. 76). According to plaintiff, she can write for only ten minutes and can type on a computer keyboard for only two minutes before needing to rest. (Id.).

With regard to her personal care, plaintiff indicated that "[she] need[s] help with washing [her] hair, because when [she] lift[s] [her] arms, they bother [her], especially with [her] left arm; [she] can't lift it as much as [her] right arm." (Tr. 72). She also wrote that "[her] thumbs [and] wrists hurt when [she] wash[es] [her] hair." (Tr. 232). She added that because of her condition, she cannot do "all [of her] basic care with no help or no pains." (Id.). Plaintiff similarly wrote that "[she] get[s] shoulder pain and [her] thumbs hurt and swell up with daily activities. [She] can't blow dry [her] hair [she] ha[s] no strength to hold [a] brush. [She] drop[s] things like [the] blow dryer, [or] hair brush. When [she is] drying [her]self [her] knee hurts when bending or twisting." (Tr. 288).

Plaintiff testified at the hearing that she goes to church about once a month, but that she no longer goes to visit her sister who lives in New York, because she "can't drive that far anymore." (Tr. 74).  Plaintiff added that she is able to drive herself, but that she needs to get a ride or take public transportation if she has taken Percocet or is experiencing chest pain.  (Tr. 45, 234, 74).  When she does take the train, she testified that "[she] gotta be going up stairs and down stairs, and by the time [she] get[s] home, [she is] so exhausted."  (Tr. 74).  After one time taking the train, plaintiff indicated that she "win[d]ed up two days in bed with just body aches all over."  (Tr. 75).  Further clarifying her difficulty taking stairs, plaintiff added that she needs to go up stairs by placing each foot on one step before proceeding, and that "after about five steps, [she] pause[s] and rest[s] for a while, and then [she] continue[s] the rest."  (Id.).  Plaintiff also testified about a trip she took to Puerto Rico with her eight sisters to celebrate Mother's Day together, but she needed to leave two weeks early due to serious pain on her left side.  (Tr. 76-77; see also Tr. 526).  She flew home early and "went straight from the airport to the emergency room."  (Tr. 77; see also Tr. 526).

Plaintiff takes, or has taken, the following medications: Neurontin/Gabapentin, Percocet, Fentanyl patches, Lexapro, Naproxen, Oxycodone, Cymbalta, Nexium, Trazodone, Zoloft, Ultram/Tramadol, Singular, Amitriptyline, Albuterol, Flonase, Wellbutrin, Prozac, and Vistaril.  (Tr. 233, 253. 280, 287, 300-01, 520, 585, 595, 625, 639, 797).  At the hearing before the ALJ, plaintiff testified that her current medications induce drowsiness; specifically, Percocet causes her to become drowsy and then she needs a one to two hour nap.  (Tr. 78-79).  Similarly, the Fentanyl patches and Neurontin make her "groggy[,]" "sleepy[,]" and "dizzy[,]" and she loses the ability to focus.  (Tr. 57-58).  Plaintiff further related that her ability to do hobbies is limited because her "meds make [her] groggy so [she] can't focus or concentrate."  (Tr. 235).

5

She indicated that her conditions affect her ability to lift, bend, stand, reach, kneel, use her hands, and concentrate.  (Tr. 236).  She denied difficulty with walking, sitting, stair climbing, understanding, following instructions, remembering things, and completing tasks.  (Tr. 236-37).

B. PLAINTIFF'S WORK HISTORY AND VOCATIONAL ANALYSIS

Over a twenty-one year period, plaintiff was employed in a variety of capacities, most recently as a CNA and a medical assistant.  (Tr. 240-42, 251; see also Tr. 45-46, 50-57, 208-14).[4] As a CNA, she would "assist with meal prep, assist patient[s] with bathing, [and perform] minor household cleaning."  (Tr. 242).  At the hearing before the ALJ, she described how after arriving at a patient's home, she would assist the patient with bathing and changing clothes,  preparing meals, and changing their linens, and would perform "light housekeeping, just [to] keep [the patient's] area clean."  (Tr. 51).  She estimated that most of the day was spent standing.  (Id.). She was let go from  her job as a CNA after her doctor advised her that she "could no longer help [her] patient[s] get up off the bed[.]"  (Id.).  The vocational expert, Michael La Raia, testified that although the work of a CNA is classified as semi-skilled medium work, it is "usually performed at the heavy or very heavy level."  (Tr. 81; see also Tr. 172-77).

Subsequent to this, plaintiff went to school to become a medical assistant, and although she missed classes frequently due to her conditions, she completed school and became employed in that capacity.  (Tr. 46-50, 307, 333, 336).  Plaintiff testified that as a medical assistant she would stand for four hours in a shift, and would never lift more than five pounds.  (Tr. 50).  In this job, she would "assist [patients] to their room, do urine dip stick, send out samples to [the] lab,

_____

[4]Plaintiff previously worked as an intake counselor for approximately nine months  in a residential drug treatment facility, as a recruiter for the Census Bureau for five or six months, as a medical assistant for a podiatrist in New York for about nine months, in a Burger King in Puerto Rico for approximately six months, and as a medical receptionist for the Cornell Scott Hill Health Center. (Tr. 52-57; see also Tr. 208-14).

assist [doctors] with exam[s], do computer work, [and] search records." (Tr. 241; see also Tr. 49-50).  She was employed for approximately three months, until February 2010, when difficulties from her pain medication caused her to stop working.  (Tr. 46-47).

The vocational expert, Michael La Raia, testified that plaintiff's past work as a client monitor is medium work, whereas her previous work as a client aide, medical receptionist, test administrator, and file clerk, were jobs performed at the sedentary or light levels of exertion.  (Tr. 81-82).  La Raia found that plaintiff had the following transferable skills: "[i]ntake, interviewing receptionist work, general office skills, computer use, data entry, filing, operating phone systems and conveying information to the public, scheduling and use of medical terminology." (Tr. 82).

The vocational expert further testified that a hypothetical individual with plaintiff's past education and work history, who is limited to light work, has the ability to sit, stand, or walk for six of the eight hours in a work day, who is limited to occasional pushing, pulling, and reaching, who can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, could work as a test administrator, a medical assistant, a client aide, a medical receptionist and a file clerk. (Tr. 82-83).  La Raia also opined that a person with these restrictions could work as a quality control inspector, an assembly worker, and a light packaging worker. (Tr. 84-85).  With an additional limitation of performing only simple tasks, the vocational expert ruled out all past relevant work other than fast food worker, but maintained that this person could perform the jobs of quality control inspector, assembly worker, and light packaging worker.  (Tr. 85-87).

La Raia also responded to several hypothetical questions from plaintiff's attorney. (Tr. 87-89).  Plaintiff's counsel altered the hypothetical from permitting occasional pushing/pulling, balancing, stooping, kneeling, crouching, and crawling, to a limitation of twenty five percent or less for those activities.  (Tr. 87-88).  The vocational expert indicated that with those restrictions, the

person could still work as a medical assistant, client monitor, client aide, and medical receptionist. (Tr. 88).  The same held true with a ten percent limitation.  (Tr. 89).  La Raia opined that if an individual could only reach in front and overhead twenty percent of the day, then the packaging work described could not be performed.  (Id.).   If the individual could not sit, stand, or walk for more than two hours in a day, then all work would be precluded.  (Tr. 90).  Similarly, if an individual could not maintain attention or concentration for twenty five percent of the workday, or would miss work at least two days per month, then La Raia opined that he or she would not be able to work in any competitive job.  (Tr. 90-91).

C. MEDICAL EVIDENCE

1. PRE-ONSET DATE OF DISABILITY (FEBRUARY 2010)

Plaintiff regularly treated at Hill Health Center ["HHC"] for mental health issues from 2007 through 2009, primarily with Eileen Bonyai, APRN.  (Tr. 530-91, 607-35, 640-59).   During the time period of July 2007 through February 2009, plaintiff's treatment notes largely reflect depression from a highly tumultuous relationship with her husband, but at some visits, plaintiff's mood was euthymic.[5]  (Tr. 547-91, 607-35, 640-59).   Treatment plan reviews from this time period indicate that plaintiff was diagnosed with post traumatic stress disorder, major depressive disorder, somatization, asthma, pain in left chest and shoulder, and global assessment of functioning ["GAF"] scores ranging between 50 and 59.[6]  (Id.).

Plaintiff's medical records for physical ailments begin with x-rays taken at Yale-New Haven

---

[5]Later treatment records from HHC are set out in more detail in Section II.C.2. infra.

[6]GAF scores are representative of a patient's overall level of functioning.  See Diagnostic & Statistical Manual of Mental Disorders, Fourth Edition, American Psychiatric Ass'n, 1994, at 30-32.  A GAF score of 51-60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. Id. at 32.  A GAF score of 41-50 is indicative of serious symptoms or serious difficulty on social, occupational, or school functioning.  Id.

Hospital ["YNHH"] of plaintiff's left hip on March 17, 2008, which showed "[m]inimal degenerative changes . . . in the hip joint medially."  (Tr. 761).  A magnetic resonance imaging ["MRI"] of plaintiff's lumbar spine, performed nine days later at YNHH, revealed "minimal degenerative disc disease at L5-S1."  (Tr. 760).  On July 7, 2008, plaintiff underwent gastric bypass surgery at YNHH. (Tr. 709-19).

Commencing in February 2009, plaintiff's medical issues were largely addressed at the Adult Primary Care Center at YNHH.  Plaintiff was seen at YNHH by Natasha McEwan, APRN, on February 4, 2009, who noted plaintiff as having carpal tunnel syndrome and major depressive disorder, and prescribed her Naproxen and Percocet.  (Tr. 330-32).  Plaintiff had a neurology consultation with Dr. Elizabeth Jonas at YNHH two weeks later (Tr. 333-35), at which Dr. Jonas noted that plaintiff "has mild cervical [degenerative joint disease] by MRI and pain has been attributed to neuropathic pain to possible brachial plexopathy, though neuro exam unrevealing."  (Tr. 333).  Dr. Jonas observed that plaintiff had infrequent flare ups that would cause her to miss school for multiple days at a time.  (Id.).  At her appointment at HCC the next day, February 19, 2009, APRN Bonyai assigned her a GAF score of 54.  (Tr. 646).

Plaintiff was seen again at HHC in March 2009, at which time she was noted as having a "sad mood and increased [symptoms] some of which are physical and related to carpal tunnel and tendinitis."  (Tr. 545).  Plaintiff was examined by APRN McEwan at YNHH on April 1, 2009 (Tr. 337-40), and was diagnosed, inter alia, with neuropathic pain, carpal tunnel syndrome, and depression. (Tr. 339).  On April 17, 2009, APRN Bonyai again gave plaintiff a GAF score of 54.  (Tr. 645). Plaintiff's next appointment with APRN McEwan was on April 28, 2009, at which she diagnosed plaintiff with  carpal tunnel syndrome and major depressive disorder, and prescribed Prevacid and Lexapro.  (Tr. 439-40).  On May 19, 2009, APRN Bonyai assigned plaintiff a GAF score of 50.  (Tr.

9

643).  APRN McEwan treated plaintiff on May 26, 2009 (Tr. 433-35), noting that plaintiff had pain in her left hip, which was described as "[d]ull aching pain-intermittent with long periods of standing; taking NSAIDS with fair relief."  (Tr. 433).  Plaintiff's carpal tunnel was described as being worse since plaintiff had returned to school to become a medical assistant.  (Tr. 435).

Plaintiff returned to HHC in April 2009, where she was described as being sad and depressed.  (Tr. 543-44).  In a visit on May 12, 2009, she reported "increased pain related to carpal tunnel syndrome."  (Tr. 541).  In a subsequent visit fifteen days later, she had a "sad mood and report[ed] . . . increasing nerve pain in her chest and arm."  (Tr. 540).  On June 22, 2009, APRN Bonyai again assigned plaintiff a GAF score of 50.  (Tr. 642).

On August 19, 2009, plaintiff was discharged from her treatment at HHC.  (Tr. 530-35; see Tr. 530, 536-37.  At the time of discharge, plaintiff was diagnosed with post-traumatic stress disorder, major depressive disorder R/M, pain disorder associated with psychological factors, and a GAF score of 58.  (Tr. 531-32).  Plaintiff indicated that with church and prayer she did not need more therapy and she had stopped taking her medication.  (Tr. 530, 535).

Plaintiff was treated by Dr. Amir H. Sadrzadeh Rafie at YNHH for pain in her left hip and "shooting pain" and weakness in her legs on October 21, 2009.  (Tr. 424-27).  Plaintiff reported having a constant pain level of four out of ten, and Dr. Sadrzadeh prescribed Ultram for her hip pain.  (Tr. 426).

Plaintiff went to the YNHH emergency room on December 25, 2009, for chronic neuropathic pain and carpal tunnel syndrome in her left arm.  (Tr. 315-29).  Plaintiff indicated that her pain had started in her left arm and then "radiated across [her] chest[,]" and she rated her pain as a seven out of ten.  (Tr. 324).   On January 6, 2010, plaintiff was seen by APRN McEwan for "[left] shoulder pain with numbness and tingling shooting down [left] arm[.]" (Tr. 414-18).  Plaintiff's

Percocet was continued and she was started on Neurontin. (Tr. 416). Plaintiff returned to the YNHH emergency room two days later with the same complaints as last time (Tr. 702-08), where she was noted as having a pain level of seven out of ten. (Tr. 702).

Plaintiff had an MRI at YNHH on January 13, 2010, which revealed that there was "straightening of the normal cervical lordosis which may be positional in nature versus muscular spasms." (Tr. 465). At the C5/6 level, there was "disc osteophyte complex which is central and eccentric towards the right which causes mild central stenosis." (Id.). At the C6/7 level, the MRI revealed a "left paracentral disc extrusion which abuts and mildly deforms the cord more prominent on the left than the right consistent with moderate to moderately severe central stenosis, blocking the exiting nerve on the left . . . . Overall appearance has markedly progressed as compared to prior study." (Id.). There was "moderate to moderately severe central stenosis at [the C6/7] level, with impingement on the exiting left nerve root." (Tr. 466).

In a referral note from APRN McEwan to the Neurosurgery Clinic at YNHH, dated January 21, 2010, APRN McEwan's multiple diagnoses included asthma, carpal tunnel syndrome, and major depressive disorder. (Tr. 344-48). The note also indicated that plaintiff had a wrist splint, and had been prescribed Naproxen, Percocet and Neurontin. (Tr. 346).

## 2. POST-ONSET DATE OF DISABILITY

Plaintiff returned to APRN McEwan at YNHH on March 31, 2010 for her "neuropathic pain 2/2 cervical canal stenosis," "carpal tunnel syndrome - improved," and depression, for which she was not taking medicine. (Tr. 350-53, 408-11). Plaintiff's Percocet prescription was refilled. (Tr. 352, 410).

Plaintiff was seen for an "urgent visit for depression" by Senior Nurse Practitioner ["SNP"] Lesley Magnussen at YNHH on April 12, 2010. (Tr. 354-56). SNP Magnussen noted that after

11

being off medicine for her depression for about a year, plaintiff had a "significant lack of energy, increased fatigue, doesn't want to get out of bed, [and] low libido." (Tr. 354). Plaintiff expressed that she did "not want[] to live anymore," because she was so miserable, and that her pain was a constant seven out of ten. (Id.).

Two weeks later, plaintiff returned to YNHH to see Dr. Jonas and APRN McEwan. (Tr. 357-62). Her Neurontin dosage was increased, Dr. Jonas noted plaintiff's history of "bizarre pain syndrome[,]" and plaintiff was "found to have left neuroformaminal encroachment and central cord compression at [the] cervical level." (Tr. 358). Plaintiff indicated that Ultram had stopped being effective at managing her pain flare ups. (Tr. 357). Dr. Jonas wrote that plaintiff was "still with pain that is very debilitat[ing and] occurs on a daily basis. Would like surgery for cervical myelopathy." (Id.). Plaintiff was continued on Percocet, Neurontin, and Fentanyl patches for her pain, and Lexapro and Wellbutrin for her depression. (Tr. 361).

Plaintiff was seen by Dr. Charles Wang and RN Dominic Novicio at YNHH on May 10, 2010. (Tr. 363-65, 395). Plaintiff stated that she found "it hard to pinch [a] bag of chips, and t[ur]ning jars with thumb." (Tr. 363). Plaintiff reported a pain level of six out of ten. (Id.). Dr. Wang observed that plaintiff had "[t]enderness in [r]ight 1st digit . . . [and in her] [l]eft hand some . . . tenderness in 3rd digits." (Tr. 364). At the same visit, RN Novicio listed plaintiff's hand pain as being a seven out of ten. (Tr. 395). X-Rays of plaintiff's hands taken at YNHH that same day, however, were normal. (Tr. 730). Plaintiff returned to YNHH's emergency department three days later (Tr. 694-97), for aching and throbbing cervical pain, at a severe degree, which prevented her from being able to bend. (Tr. 694).

A mental health/substance abuse evaluation for plaintiff was completed at HHC on June 1, 2010 by Sherlyne Louis, MS-Clinician (Tr. 592-99; see also Tr. 529), at the request of plaintiff's

12

primary care provider at YNHH, who "noticed that [plaintiff] was feeling down and suggested that [she] get help." (Tr. 592, 598). Plaintiff reported "feeling depressed since los[s] of job in 2/10 and health problems." (Tr. 592). Her symptoms included "isolation, helplessness, sadness, lack of appetite, lack of sleep, frustration and concerns about her health[,]" as well as nightmares. (Tr. 592, 598). Plaintiff was diagnosed, inter alia, with major depressive disorder recurrent moderate, post traumatic stress disorder, "problems [with] spine, carpal tunnel, nerve pain," and a GAF score of 48. (Tr. 598). Weekly individual therapy and a psychiatric evaluation with an APRN were recommended. (Id.).

Such psychiatric evaluation took place twenty-seven days later with APRN Bonyai at HCC. (Tr. 520-25). Plaintiff emphasized that an increase in her shoulder pain along with use of opioids "forced her to quit her [j]ob." (Tr. 520, 523). Her symptoms included "[a]nhedonia, hypersomulence, lethargy [and] hopelessness since stopping work." (Tr. 520; see also Tr. 523). She was diagnosed with major depressive disorder, somatization, asthma, pain in left shoulder, and a GAF score of 49. (Tr. 522-23). Plaintiff was prescribed Cymbalta. (Tr. 523-24). APRN Bonyai assessed that plaintiff was "[m]oderately ill[,]" which was ranked as a four on a scale of one to seven. (Tr. 523).

On June 17, 2010, plaintiff was examined by Clinician Louis at HHC, to whom plaintiff "reported sharp pain in her left shoulder . . . . Client describes her pain as . . . 'getting [an] electric shock.'" (Tr. 526). She reported that a surgeon had told her that her pain was caused by a bone in her left shoulder that was pinching a nerve. (Id.).

On July 1, 2010, Clinician Louis prepared a treatment plan review for plaintiff (Tr. 605-06), in which she diagnosed plaintiff with major depressive disorder, carpal tunnel, nerve pain, "problem [with] spine," and a GAF score of 48. (Tr. 605). Eleven days later, plaintiff returned to HHC,

13

reporting that she was "feeling some pain in her shoulder. Client said that when the pain is really bad she can't do anything." (Tr. 518). However, at all of plaintiff's visit to HCC during the month of July 2010, plaintiff's mood was also described as euthymic. (Tr. 516-19).

Plaintiff was seen again by Dr. Jonas on July 26, 2010. (Tr. 479-81). Plaintiff reported that her pain was not well-controlled, and Dr. Jonas subsequently increased plaintiff's Neurontin prescription. (Tr. 479-80). Plaintiff missed a session at HHC on August 5, 2010, due to her "having bad shoulder pain." (Tr. 515). Plaintiff was seen by Clinician Louis one week later. (Tr. 514). She had a depressed mood and reported having "no motivation to do anything, wanting to stay in bed and helplessness." (Id.). The next week, on August 19, APRN Bonyai assigned plaintiff a GAF score of 50, and increased her Cymbalta and further prescribed Trazodone. (Tr. 637).

On September 1, 2010, Clinician Louis completed another treatment plan review of plaintiff (Tr. 603-04), in which she diagnosed plaintiff with major depressive disorder, carpal tunnel, nerve pain, "problem [with] spine," and a GAF score of 48. (Tr. 603). Clinician Louis commented that plaintiff "just want[s] to feel better so she can start looking for a job." (Tr. 604). Plaintiff was seen at HHC eight days later, when Clinician Louis observed that plaintiff had a "mild depressed mood with constricted affect. Client reports that she has been in a lot of pain the past week which caused some tiredness. Client reports decrease[d] energy and lack of sleep." (Tr. 510). On September 20, 2010 APRN Bonyai noted that plaintiff reported having a pain level of "9/10 on most days." (Tr. 636). Plaintiff was assigned a GAF score of 48, and prescribed Cymbalta and Trazodone. (Id.). Plaintiff returned on September 30, 2010, and Clinician Louis wrote that plaintiff had "been having a lot of chest pain in the past week," and that she was depressed. (Tr. 508).

Plaintiff went back to YNHH on September 29, 2010 for a pre-op appointment (Tr. 668-83),

14

complaining of "severe" pain in her left chest area and back, at which point she was sent to the YNHH emergency room.  (Tr. 676).  As Dr. Nduka Amankulor and Dr. Michael Diluna explained: "I cannot ascribe this pain to a cervical disc and the most prudent thing to do is to send her to the emergency room to have this chest pain worked up . . . ." (Id.).  Patricia Mason, APRN, observed that plaintiff's "herniation has restricted her neck movement but more so it has restricted left arm movement and is associated with left arm weakness and may occasional[ly] have numbness and tingling down to fingertips in left arm.  She has worsening pain when standing or sitting for prolonged periods of time." (Tr. 679).  The ER physician concluded that plaintiff's pain was "likely not" cardiac-related.  (Tr. 672).

3.  RECORDS POST DATE LAST INSURED

On October 11, 2010, APRN Bonyai at HHC described plaintiff as depressed, with "anhedonia, tearfulness and periods of hopelessness[,]" and having a pain level of nine out of ten. (Tr. 929).  Two days later, on October 13, 2010, Dr. Diluna performed a "C6-C7 anterior cervical diskectomy and fusion . . . " at YNHH.  (Tr. 660; see also Tr. 661-67).  This surgery was performed to treat plaintiff's C7 radiculopathy and cervical disk displacement.  (Tr. 660).  A CT scan performed after the surgery indicated that "[a]t  C5-C6 there is central disc osteophyte complex with mild canal stenosis and no significant neuroforaminal narrowing. Posterior to C6 there is calcification of the posterior longitudinal ligament . . . [and] status post anterior cervical discectomy and fusion of C6-C7 with no significant spinal stenosis or neuroforaminal narrowing."  (Tr. 721).

On November 1, 2010 plaintiff was seen at HHC by Clinician Louis, who observed that plaintiff had "constricted affect and sad mood."  (Tr. 897).  Three days later, APRN McEwan at YNHH noted that plaintiff's cervical disk fusion was "doing well[,]" and her carpal tunnel syndrome was "[i]mproved" while using wrist splints and pain medication.  (Tr. 783; see also Tr. 784-86).

15

Plaintiff's depression was listed, and her multiple medications were continued.  (Id.).  Plaintiff, back at YNHH on November 8, 2010, was seen by Daryl Wentworth, RN, CNII.  (Tr. 780-81).  Plaintiff complained of right knee pain, indicating that "she feels like it [is] going to 'give out[.]'"  (Tr. 780). She was advised to "[r]est" and "[e]levate" her leg.  (Id.).  On the same day, plaintiff was seen for medication management at HHC by APRN Bonyai, who observed that plaintiff was "depressed [with] blunted affect[,]" and that she had "made a good recovery from neck surgery, but is now complaining about increase in knee pain."  (Tr. 928).

The next day, plaintiff was seen by Dr. Elaine Cong at YNHH Primary Care Center  (Tr. 776-78), who noted that plaintiff's chronic right knee pain was "osteoarthritis [with] crepitus."  (Tr. 776).  Plaintiff was also noted as having left knee pain that  was opined to be a "likely menisceal tear vs. osteoarthritis."  (Tr. 778).   Plaintiff was observed  having right knee pain when squatting and rotating the knee and an unstable gait due to the left knee having difficulty with weight bearing, although she had full range of motion and no effusion.  (Tr. 777).   Dr. Cong also prescribed plaintiff crutches and ordered an MRI for plaintiff's knee pain.  (Id.).  Despite these findings, plaintiff was noted as having full range of motion and 5/5 strength in both knees.  (Id.).

The following day, November 10, 2010, Dr. Jonas saw plaintiff (Tr. 773-75), observing that plaintiff "feels much[,] much  better after cervical disc surgery and wants to decrease pain medications.  Strength is good and there is no numbness."  (Tr. 773).  Plaintiff indicated that she used an assistive device in order to walk.  (Tr. 775).  One week later, plaintiff called YNHH, complaining of pain in her left shoulder, back, and neck.  (Tr. 772).  Plaintiff indicated her pain was a seven out of ten.  (Id.).  She also reported this pain when canceling a session with Clinician Louis, stating that "she thought that after a month it would be ok for her to start carrying heavy bags and ended up having severe pain on the shoulder that she had the surgery on."  (Tr. 895; see also Tr. 896 (cancelling the session the week prior)).

16

Plaintiff had an MRI of her right knee at YNHH on December 2, 2010. (Tr. 769). The MRI revealed a "[f]ocal full thickness articular cartilage defect in the medial femoral condyle with underlying subchondral edema. . . . Otherwise unremarkable exam." (Tr. 769). Imaging of plaintiff's spine performed at YNHH on December 15, 2010, revealed that "[a]lignment is maintained[,]" and that there was "[n]o evidence of hardware failure." (Tr. 766). At an appointment that same day, Dr. Diluna noted that plaintiff's "results have been terrific. She had a repeat set of x-rays, which show perfect placement of the instrumented hardware and beginnings of bony fusion. She report[ed] that her pain is markedly decreased in severity." (Tr. 792; see also Tr. 766). Dr. Diluna also indicated that plaintiff was "thrilled that she has undergone the surgery and she is beginning to come down off of her pain medicines and is weaning her Percocet and Fentanyl." (Tr. 792). Plaintiff was seen by Hsaio-Ying Chin, MD at YNHH on December 27, 2010. (Tr. 762-65). Dr. Chin commented that the recent MRI showed "full thickness erosion in medial epicondyle [weight] bearing region." (Tr. 762). Tramadol was prescribed for pain and a knee brace was given for her right knee. (Tr. 764).

Plaintiff also had several appointments during the month of December 2010 with her mental health counselors. On December 1, 2010, Clinician Louis at HHC assigned plaintiff a GAF score of 48. (Tr. 916-17). Twelve days later, plaintiff saw Clinician Louis, who described plaintiff as having a "mild[ly] depressed mood and constricted affect." (Tr. 891). One week later, on December 20, Clinician Louis observed plaintiff using a crutch and limping due to pain in her knee. (Tr. 890). Clinician Louis again observed plaintiff limping on December 30, 2010, and plaintiff was also observed to be sad with a constricted affect. (Tr. 888-89). On January 5, 2011, however, plaintiff presented "with brighter mood and affect, but [did] not acknowledge decrease in [symptoms]." (Tr. 925).

Plaintiff returned to the YNHH emergency room on January 25, 2011 (Tr. 788-91),

17

complaining of pain in her right knee.  (Tr. 788).  Her pain was noted as being constant, and her range of motion was limited because of the pain.  (Tr. 788-89).  Plaintiff met with APRN McEwan three days later, on January 28, 2011.  (Tr. 813-16).  Plaintiff's disc fusion was "doing well[,]" carpal tunnel syndrome was "[i]mproved[,]" her depression was noted, and a knee brace and pain medication continued to be recommended for her left knee.  (Tr. 813-14).  A recent MRI had "revealed full cartilage loss."  (Tr. 814).  APRN McEwan indicated that plaintiff's "pain [is] currently well controlled with pain medication."  (Id.).

Plaintiff saw APRN Bonyai at HHC on February 2, 2011, who described plaintiff as being "mildly depressed with anhedonia."  (Tr. 924).  One week later, Clinician Louis noted that plaintiff came to the session limping and described her mood as a two out of ten, with a ten being the most depressed.  (Tr. 881).  On March 1, 2011, Clinician Louis recorded plaintiff's mood as a five out of ten, due to continuing struggles in her marriage.  (Tr. 878).  Plaintiff "reported feeling depressed" for the same reasons during a session with Clinician Louis sixteen days later.  (Tr. 876).

At an appointment with Dr. Jonas on February 21, 2011 (Tr. 819-20), Dr. Jonas commented that plaintiff "has had a couple of episodes of pain that occur over baseline.  These happen three times a week and make her stop what she is doing.  She also has fleeting episodes of sharp pain in left shoulder while driving if she tenses up."  (Tr. 819).  Her prescriptions for Fentanyl, Percocet and Neurontin were continued.  (Id.). Plaintiff had a physical therapy evaluation at YNHH on February 24, 2011.  (Tr. 821-27).  Plaintiff indicated her pain was in her neck and shoulder, that it currently was a seven out of ten, and that her pain had been as high as a nine and as low as a four in the last week.  (Tr. 822).

Plaintiff had a "somewhat brighter mood and affect" during an appointment with APRN Bonyai at HHC on March 3, 2011.  (Tr. 923).  During this session, plaintiff complained about  pain in her right knee.  (Id.).  Four weeks later, on March 31, 2011, APRN Bonyai described plaintiff as

18

"mildly depressed with constricted affect."  (Tr. 921).

A chest x-ray taken on March 22, 2011 at YNHH showed that the "cardiac silhouette is within normal limits.  There is no consolidation, pleural effusion, or evidence of pulmonary edema."  (Tr. 831).  A CT scan of plaintiff's cervical spine performed on April 6, 2011 at YNHH revealed "[a]nterior fusion of C6-C7 with interval development of mild anterolateral bridging osteophytosis more so on the left.  Unchanged calcification of the posterior longitudinal ligament at level of C6 with mild canal stenosis.  Unchanged disc osteophyte complex at C5-C6 with mild canal stenosis."  (Tr. 833). An electromyography performed five days later at YNHH (Tr. 834-35) indicated "electrodiagnostic evidence for a mild median neuropathy at the left wrist ([carpal tunnel syndrome])."  (Tr. 834).  In addition, there was "no electrodiagnostic evidence for a cervical radiculopathy."  (Id.).  On April 13, plaintiff had an MRI at YNHH of her left shoulder and left brachial plexus.  (Tr. 836-37).  The MRI revealed the following: "1. Supraspinatus tendinopathy without evidence of a discrete rotator cuff tear.  2. Subacromial/subdeltoid bursitis.  3. Acromioclavicular osteoarthritis." (Tr. 836).  An MRI of plaintiff's brachial plexus was normal except for an "[i]ncreased T2 signal . . . in the supraclavicular soft tissues."  (Tr. 837).

Plaintiff saw Clinician Louis on April 8, 2011, in which she was described as "depressed" with "constricted" affect, after a particularly painful interaction with her husband.  (Tr. 873).  One week later, Clinician Louis again noted plaintiff's "depressed mood and constricted effect," and plaintiff commented: "I'm so depressed and my physical pain is getting worse."  (Tr. 872).  Plaintiff similarly had a depressed mood at her next session on April 28.  (Tr. 871).  On May 4, 2011, Clinician Louis described plaintiff as having "continued depressive [symptoms] of sadness, tired[ness and], los[s of] of interest."  (Tr. 870).  Plaintiff again was noted as being sad or depressed during the remainder of her visits with Clinician Louis in May 2011, with reports of depression, and "lack of energy and motivation."  (Tr. 866-70).  On May 16, 2011, plaintiff noted

that she was having knee pain, which she attributed to "rainy weather." (Tr. 868).

Plaintiff returned to YNHH on April 29, 2011 (Tr. 843-47), with complaints of continued pain in her left shoulder. (Tr. 843). Plaintiff's depression was noted as being "[s]table" on Cymbalta and Trazodone with an improved mood, but plaintiff indicated that she "[h]as increased co[un]seling sessions . . . weekly to cope with increased stress." (Id.). In an appointment with Dr. Jonas on May 11 (Tr. 852-54), plaintiff relayed that she "recently had a bout with increased shoulder pain and had to increase [F]entanyl patch to 100 again." (Tr. 852). Plaintiff felt better after the increase in pain medication. (Id.). Plaintiff saw APRN Bonyai on June 1, 2011; she was noted as being depressed and as having increased pain. (Tr. 920).

Dr. Jing Hughes of YNHH saw plaintiff on June 13, 2011 (Tr. 856-58), at which time plaintiff indicated she had sharp shoulder pain after she "lifted a heavy box and pulled on the laundry basket[.]" (Tr. 856). Dr. Hughes opined that this was "likely [a] pulled muscle." (Tr. 858). That same day Clinician Louis noted that plaintiff's mood was stable and plaintiff denied "any significant indication of depression at [that] time." (Tr. 939). Dr. Jonas saw plaintiff again on August 8 (Tr. 863-69), noting that plaintiff had "severe pain in front of chest in same place as before, near left shoulder." (Tr. 863). Plaintiff's Fentanyl patch was increased to 175 q, and Dr. Jonas commented that a recent MRI "had shown soft tissue swelling over suprascapular region, supraspinatous tendinitis and also shoulder bursitis. Possible that shoulder arthritis contributing to pain." (Id.).

At her July 6, 2011 appointment with Clinician Louis, plaintiff had a "bright affect" and her mood was stable despite being in the process of obtaining a divorce from her husband. (Tr. 938). Plaintiff remained in a good mood two weeks later, on July 20, 2011, after her divorce from her husband was finalized. (Tr. 935). Five days later, on July 25, 2011, Clinician Louis noted that plaintiff denied "any significant increase in depression[,]" and that plaintiff "is feeling good about herself." (Tr. 934).

In contrast, plaintiff was treated on July 27, 2011 by APRN Bonyai, who noted that plaintiff was "mildly depressed and blunted[,]" and was complaining of a period of increased pain.  (Tr. 918).  APRN Bonyai, worried about an increased use of opiate pain medications, did not increase plaintiff's medications.  (Id.).  At her August 3 appointment with Clinician Louis, plaintiff denied "any increase in depressive [symptoms] at this time."  (Tr. 933).  Plaintiff saw APRN Bonyai one week later, on August 10, who noted that plaintiff was "mildly depressed and reports continued pain."  (Tr. 949).  On September 20, 2011, APRN Boynai described plaintiff as "mildly depressed with constricted affect."  (Tr. 947-48).  Plaintiff also reported having "continued pain in her shoulder[,]" and that she was going to be starting physical therapy.  (Tr. 947).  APRN Bonyai commented that plaintiff "continues with decrease[d] insight into how emotional state affects pain levels, despite being physically active while on vacation in Cancun."  (Id.).  APRN Bonyai added that plaintiff has a history of "depressed mood and somatization, continues to present as depressed. [Plaintiff] was able to[] enjoy herself on vacation, but return to household she shares with her ex [husband] led to a return of [symptoms]."  (Id.).  The next day, plaintiff met with Clinician Louis, who noted that plaintiff's mood was stable, although she indicated that following her divorce she "has fears of being lonely."  (Tr. 945).

D. MEDICAL OPINIONS

On August 16, 2011, Carol R. Honeychurch, MD, completed a Physical Residual Functional Capacity Assessment of plaintiff for SSA (Tr. 98-101), in which she determined that while plaintiff's conditions could be expected to cause her pain and symptoms, plaintiff was only partially credible, her statements about the intensity and limiting effects of these symptoms were not substantiated by objective medical evidence alone, and she could perform light work.  (Tr. 98).  Dr. Honeychurch opined that plaintiff could occasionally lift or carry twenty pounds, and frequently lift or carry ten pounds.  (Tr. 99).  She further indicated that plaintiff could stand, walk, or sit for a total of six

21

hours in an eight hour work day, and that her ability to push or pull was limited in her upper extremities.  (Id.).  Dr. Honeychurch opined that plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders.  (Id.).  Additionally, plaintiff should avoid concentrated exposure to vibration and hazards, and she is limited in her ability to reach overhead with her right or left arms.  (Tr. 100-01).

Two days later, Thomas Hill, MD, completed a Psychiatric Review Technique for SSA (Tr. 97-98), in which he assessed Listing 12.04 – Affective Disorder, and found that plaintiff has an affective disorder, mild difficulties in social functioning and maintaining concentration, persistence, or pace, and no restrictions in activities of daily living.  (Tr. 97).  Dr. Hill further opined that plaintiff's psychiatric "allegations are historically credible, considered stabilized on meds at last claim decision of 5/26/09 . . . [claimant] was still taking Lexapro, an antidepressant, at the [date last insured], so we can assume her psychiatric symptoms were stable and still nonsevere at the [date last insured.]"  (Id.).

A Disability Determination Explanation for the reconsideration level was completed in January 2011.  (Tr. 105-16).  Plaintiff indicated that starting in August  2010, her conditions became worse, stating that "constant movement of my left arm triggers pain.  My depression has gotten worse[] and I am tired of being in pain and unable to function normally."  (Tr. 106).  On January 14, 2011, Adrian Brown, PhD, found that plaintiff had severe spine disorder, deficiency anemia, and affective disorder.  (Tr. 109-10).  Dr. Brown further indicated that plaintiff had mild difficulties in maintaining social functioning, concentration, persistence, or pace, and no restriction in activities of daily living.  (Tr. 110).  Ten days earlier, on January 4, 2011, Dr. Kurshid Khan completed an RFC assessment of plaintiff that is identical to the findings of Dr. Honeychurch, and he also found plaintiff to be only partially credible with regard to the intensity of her symptoms. (Tr. 111-15).

22

Dr. Jonas authored five letters on plaintiff's behalf, two of which were within the relevant period at issue, and two of which predated this period, on April 18, 2007 and February 18, 2009.[7] In the April 2007 letter, Dr. Jonas had opined that plaintiff "cannot work because of severe, unremitting pain" (Tr. 308), although plaintiff did continue working subsequent to this.[8]  In the February 2009 letter, Dr. Jonas opined that plaintiff might miss school for several days at a time due to pain, and that pain of this severity was likely to occur "about once every [two to three] months." (Tr. 307, 336).  On March 8, 2010, a month after plaintiff's onset date of disability, Dr. Jonas wrote another letter, similarly opining that plaintiff has had "severe pain for many years stemming from an accident, but the pain has worsened recently and [plaintiff] cannot get control of it.  We therefore think it is impossible for [her] to work at this time." (Tr. 349).  Dr. Jonas wrote a similar letter on August 9, 2010, again opining that plaintiff is "disabled from chronic pain and disc disease and cannot sit, stand, walk, lift, carry, bend, understand, carry out or remember instructions.  The pain is too severe for [her] to be able to effectively perform any of these duties at work." (Tr. 487).

On March 2, 2011, Clinician Louis and Dr. Nathalie Lara completed a Mental Impairment Questionnaire for the Connecticut Disability Determination Services. (Tr. 796-800).  The answers to the questionnaire indicated a "[s]light improvement" since plaintiff had begun treatment.  (Tr. 797).  Plaintiff was diagnosed with major depressive disorder, with moderate recurrence, and cocaine abuse that was in remission.  (Id.).  Plaintiff had been prescribed Cymbalta and Vistaril.

---

[7]She also completed a Physical Medical Source Statement in November 2011 and another in November 2012, both of which are discussed in this section and in Section IV.A. infra, along with the September 2012 letter.

[8]On February 16, 2007, Dr. Anita Karne of the YNHH Primary Care Clinic had prepared a letter representing that plaintiff "has [a] medical condition that causes severe neuropathic pain[,]" but that she was "medically able to return to work," but with "light duties only with no heavy lifting."  (Tr. 309).

(Id.).  Plaintiff's psychiatric history was noted as starting in 2004, with symptoms worsening in 2010 with the loss of "her job due to heath problems[,]" and her current symptoms were noted as "isolation, helplessness, sadness, lack of appetite, lack of sleep, and frustration."  (Id.).  Her symptoms were described as stable while she was compliant with medication and her mood was described as being depressed or anxious.  (Tr. 797-98).  Dr. Lara and Clinician Louis opined that plaintiff had an "[o]bvious [p]roblem" with regard to "[h]andling frustration appropriately" and "[c]arrying out multi-step instructions."  (Tr. 798-99).  She had a "[s]light [p]roblem" with "[u]sing appropriate coping skills to meet ordinary demands of a work environment," "[a]sking questions or requesting assistance," and "[p]erforming work activity on a sustained basis (i.e., 8 [hours] per day 5 days a week)."  (Id.). No other problems were noted.  (Id.).

Dr. Jonas completed a Physical Medical Source Statement on November 7, 2011, in which she relied upon the April 13, 2011 MRI of plaintiff's shoulder, both dates being beyond her date last insured of September 30, 2010.  (Tr. 951-54).  Plaintiff was diagnosed with "chronic pain left chest [and] shoulder[,]" and this pain was described as "[c]onstant and severe[.]"  (Tr. 951).  Her prognosis was "[p]oor."  (Id.).  Dr. Jonas opined that plaintiff was limited to sitting for only five minutes at a time before needing to get up, and could not stand for any period of time before needing to sit or lie down.  (Tr. 952).  In an eight hour workday, Dr. Jonas further opined that plaintiff would be limited to sitting, standing, or walking for less than two hours.  (Id.).  Dr. Jonas indicated that plaintiff could never carry ten pounds or more, and could never twist, stoop, bend, crouch, squat, climb stairs or climb ladders.  (Tr. 953).  Dr. Jonas predicted that in a given work day plaintiff's symptoms were likely to interfere with her attention and concentration so that she could not perform even simple work tasks twenty five percent of the time or more.  (Tr. 954).  Dr. Jonas lastly opined that plaintiff was "[i]ncapable of even 'low stress' work," due to her "severe unremitting pain[,]" and that she could be expected to miss more than four days of work per

month due to this pain.  (Id.).

On September 26, 2012, Dr. Jonas wrote a letter in which she opined that plaintiff "continues to suffer from chronic unrelenting pain in [her] neck and shoulder due to an accident many years ago.  This pain is unremitting and has required us to re-escalate her analgesic patches recently because the pain again worsened."  (Tr. 956).  Dr. Jonas further opined that "[t]here is no possibility of her being able to function at work successfully at this time and I do not see any possibility in the near future, therefore I believe she needs to be disabled indefinitely."  (Id.).

## III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008), quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); see also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).   However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to

determine the reasonableness of the ALJ's factual findings.  See id.  Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See 42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment.  See 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, at the fourth step, she will have to show that she cannot perform her former work.  See 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant shows that she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See

Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Tracy found that plaintiff  had not engaged "in substantial gainful employment during the period from her alleged onset date of February 19, 2010 through her date last insured of September 30, 2010."  (Tr. 19, citing 20 C.F.R. § 404.1571 et seq.).  ALJ Tracy then concluded that plaintiff has the following severe impairments: degenerative disk disease of the cervical spine with neuropathy, carpal tunnel syndrome, degenerative joint disease of the hip, osteoarthritis, and depression (Tr. 20, citing 20 C.F.R. § 404.1520(c)), but that plaintiff's impairment or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404.  (Tr. 20-22, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  In addition, at step four, ALJ Tracy found that after consideration of the entire record, plaintiff had the RFC to perform light work through her date last insured (Tr. 22-27, citing 20 C.F.R. § 1567(b)), but with the following limitations:

> The claimant had the ability to sit/stand/walk six hours in an eight-hour workday. The claimant was limited to occasional pushing/[pulling] in the left upper extremity and occasional overhead reaching with both upper extremities.  She was limited to no climbing of ladders or scaffolds and only occasional climbing of ramps and stairs. She was limited to occasional balancing, stooping, kneeling, crouching and crawling. She was also limited to no exposure to workplace hazards such as moving mechanical parts, operating a motor vehicle, and working at unprotected heights or vibrations.  The claimant was further limited to performing simple tasks.

(Tr. 22).

The ALJ also held that through her date last insured, plaintiff was unable to perform her past relevant work as a medical assistant, client monitor, medical receptionist, test administrator,

and file clerk (Tr. 27-28, <u>citing</u> 20 C.F.R. § 404.1565), but she concluded that there were jobs that existed in significant numbers in the national economy that plaintiff could perform, such as quality control inspector, assembly type worker, packaging worker, and sedentary packaging worker.  (Tr. 28-29, <u>citing</u> 20 C.F.R. §§ 404.1569, 404.1569(a)).  Accordingly, the ALJ concluded that plaintiff has not been under a disability "from February 19, 2010, the alleged onset date, through September 30, 2010, the date last insured."  (Tr. 29, <u>citing</u> 20 C.F.R.  § 404.1520(g)).

Plaintiff moves for an order reversing the decision of the Commissioner, or in the alternative an order remanding for a new hearing, on grounds that the ALJ committed a number of factual errors, misreadings, distortions, mischaracterizations, and misstatements of the evidence (Dkt. #19, Brief at 11-18); the ALJ failed to properly follow the treating physician rule (<u>id.</u> at 18-24); plaintiff's impairments meet Listing 1.04A (<u>id.</u> at 24-28); the ALJ failed to properly determine plaintiff's credibility (<u>id.</u> at 28-31); the ALJ failed to properly determine plaintiff's RFC (<u>id.</u> at 31-32); and defendant has failed to meet her burden of proof with regard to step five. (<u>id.</u> at 32-36; <u>see also</u> Tr. 201-11).

In response, defendant contends that the ALJ did not mischaracterize the evidence (Dkt. #20, Brief at 6-10); the ALJ properly discounted Dr. Jonas' and Dr. Lara's treating source opinions (<u>id.</u> at 10-16); the ALJ properly determined that plaintiff's combined impairments did not meet or medically equal a listing (<u>id.</u> at 16-19); the ALJ's credibility assessment is supported by substantial evidence (<u>id.</u> at 19-22); the ALJ's RFC assessment is supported by substantial evidence (<u>id.</u> at 22-24); and the ALJ properly relied on vocational expert testimony at step five.  (<u>Id.</u> at 24-25).

A. TREATING SOURCES' OPINIONS

"The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." <u>Burgess</u>, 537 F.3d at 128, <u>quoting</u> <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003)(internal quotations & alteration

omitted).  Generally, "the opinion of claimant's treating physician as to the nature and severity of

the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in [the] case record.'"    Burgess, 537 F.3d at 128, quoting 20 C.F.R. §

404.1527(c)(2)(formerly § 404.1527(d)(2))(when the ALJ "find[s] that a treating source's opinion

on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other

substantial evidence, . . . [the ALJ] will give it controlling weight.")(additional citations omitted);

see also Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple citations omitted).   Under

the treating physician rule, an ALJ assigns weight to the treating source's opinion after considering:

> (i) the frequency of the examination and the length, nature, and extent of the
> treatment relationship; (ii) the evidence in support of the opinion; (iii) the
> consistency of the opinion with the record as a whole; (iv) whether the opinion is
> from a specialist; and (v) other factors brought to the Social Security
> Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(per curiam), citing 20 C.F.R. §

404.1527(c)(2)(formerly § 404.1527(d)(2)).  "After considering the above factors, the ALJ must

'comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion.'"

Burgess,  537 F.3d at 129, quoting Halloran, 362 F.3d at 33; see 20 C.F.R. § 404.1527(c)(2)

(stating that the agency "will always give good reasons in our notice of determination or decision

for the weight we give [the claimant's] treating source's opinion")(emphasis added)).   "[T]he ALJ

cannot arbitrarily substitute [her] own judgment for competent medical opinion." Rosa, 168 F.3d

at 79 (citation & internal quotations omitted).

Dr. Jonas prepared five letters in which she opined that plaintiff was disabled – in April

2007, February 2009, March 2010, August 2010, and September 2012. (Tr. 307-08, 336, 349, 487,

956).  However, the ALJ properly assigned "little weight" to Dr. Jonas' multiple opinions after

determining that they were inconsistent with the record as a whole.  (Tr. 23-24).  The ALJ concluded that Dr. Jonas' opinions rendered in April 2007 and February 2009 occurred before the alleged onset date and thus were "not relevant to the current application pending for disability and are therefore, given little weight." (Tr. 24).  The fact that plaintiff continued to be employed until February 2010, approximately one to three years after these letters were written, indicates that the ALJ was correct in discounting these opinions.  Therefore, the ALJ did not err in discounting these first two opinions.

Dr. Jonas also opined that plaintiff was unable to work in March 2010 and August 2010, during the relevant time period.  (Tr. 349, 487).  The opinion from March 2010 is five sentences long, essentially just a bare assertion that plaintiff is disabled, unaccompanied by any objective medical evidence.  (Tr. 349).  The letter simply indicates that plaintiff has had "severe pain for many years[,]" that the pain "has worsened recently[,]" and that plaintiff "cannot get control of it." (Id.).  The doctor thus opined that it was "impossible for [plaintiff] to work at this time[,]" that her "absence from work [would] be indefinite," but that she "may be able to be re-instated if the pain gets controlled[,]" and that plaintiff would "plan on a leave of absence of about one year." (Id.).  Contrary to this opinion, however, later in March 2010, plaintiff reported "great relief[,]" with the Fentanyl patch.  (Tr. 350).  Additionally, the results of a neurological examination completed one month later revealed "left neuroformaminal encroachment and central cord compression at [the] cervical level[,]" however, plaintiff had "normal muscle tone and bulk, no fasciculation or drift, and 5/5 strength bilaterally throughout." (Tr. 358).  At that visit, Dr. Jonas referred to plaintiff's issue as a "bizarre pain syndrome[.]" (Id.).

The opinion from August 2010 is similarly limited in its factual support, consisting of just two sentences.  (Tr. 487).  Dr. Jonas' opinion that plaintiff cannot sit, walk, understand, or follow instructions and that her "pain is too severe for [her] to be able to effectively perform any of these

duties at work[]" is countered by plaintiff's ADL from April 2010, some four months earlier, in which plaintiff indicated that she had no difficulties with these activities.  (Tr. 236, 238).  As such, the ALJ did not err in her decision not to defer to Dr. Jonas' opinion that plaintiff was "disabled from chronic pain and disc disease[.]"  See Roma v. Astrue, 468 F. App'x 16, 19 (2d Cir. 2012)(an ALJ is "not required to defer" to treating physician opinion that claimant is unable to work, in light of other evidence such as the claimant's ability to "perform a reasonably broad range of light, non-stressful activities . . . , including driving, reading, sending email, and independently performing the activities of daily living while his wife worked full-time.").

Additionally, although the medical records during this time period reflect plaintiff's complaints of pain, those records and the 2010 opinions of Dr. Jonas were rendered prior to plaintiff's October 2010 surgery, and thus do not reflect the outcome of that surgery.  Dr. Diluna, who is also a treating source, indicated that plaintiff's condition was improved and that plaintiff's pain was reduced, which had allowed her to start "weaning her Percocet and Fentanyl." (Tr. 792).  Plaintiff also was described as being "thrilled" with how the surgery went, and "[h]er results have been terrific." (Id.).  The objective evidence also supports Dr. Diluna's findings about the successfulness of the surgery, as an x-ray revealed that the placement of the hardware was "perfect[.]" (Id.).  Plaintiff's later shoulder pain in June 2011 was also not serious given the opinion of Dr. Hughes, who opined that plaintiff's shoulder pain "likely" was the result of a "pulled muscle." (Tr. 858).  Dr. Hughes is another treating source whose opinion was rendered after the October surgery, and plaintiff's June 2011 pain occurred almost a year after her date last insured and almost a year-and-a-half after her onset date of disability.[9]

---

[9]Even if the ALJ had accepted plaintiff's complaints about the severity of her shoulder pain in February 2011, the objective evidence, and reports from plaintiff's treating sources, all indicate that directly following her surgery she was doing well, with minimal pain, and was not disabled due to any issue with her spine.  (Tr. 783-84, 928, 773-74, 766, 792, 813-14).  This is evidence that "a reasonable

Dr. Jonas' Physical Medical Source Statement from November 2011 (Tr. 951-54), disregarded by the ALJ, is similarly contradicted by plaintiff's own testimony and the objective medical evidence, and was issued more than one year after the date last insured.  For example, Dr. Jonas opined that plaintiff would be able to stand for zero minutes and sit for five minutes at one time before needing to change position, and that plaintiff could walk for zero blocks before needing to rest.  (Tr. 952).  However, at the  hearing before the ALJ, the very next day, plaintiff testified that she can walk four or five blocks before there is any issue with her knee, and that the pain gets worse after "walking and sitting for a long time or standing for a long time, bending." (Tr. 68).   When pressed further by the ALJ, plaintiff testified that she can sit "[n]ot more than an hour," and that she can stand for "approximately" the same time.  (Id.).  Similarly, Dr. Jonas opined that plaintiff could never climb stairs.  (Tr. 953).  However, plaintiff  testified that she was able to take public transportation, although she became fatigued after going up and down stairs, and she lives on a second floor apartment, which requires her to navigate thirteen stairs.  (Tr. 74, 823).[10]

The opinion of Dr. Jonas from September 2012 is almost two years after the date last insured and does not render a retrospective opinion. (Tr. 956).   In addition, while providing more supporting information than the previous opinions, this letter is nonetheless equivocal in its conclusion.  (Id.).  The four-sentence letter provides that plaintiff "continues to suffer from chronic, unrelenting pain in [her] neck and shoulder[,]" which "pain is unremitting and has required [her

---

mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, (1971).

[10]Dr. Jonas apparently did not consider plaintiff's knee condition or wrist pain to be disabling, as neither is mentioned in the medical source statement. When asked the location of plaintiff's pain, Dr. Jonas indicated only that plaintiff had "[c]onstant severe pain [left] shoulder & chest." (Tr. 951).  Hence, no doctor has opined that plaintiff's knee or wrist pain was totally disabling.

doctors] to re-escalate her analgesic patches recently because the pain worsened." (Id.). However, the letter is inconsistent as to the duration of plaintiff's impairment, in that it concludes that "[t]here is no possibility of her being able to function at work successfully at this time[,]" the doctor did not "see any possibility in the near future," so that she opined that plaintiff is "disabled indefinitely." (Id.)(emphasis added).[11]

As to the opinion of Dr. Lara, completed in March 2011 (Tr. 796-800), some five months after the date last insured and more than one year after plaintiff's onset date, the overall evidence of record similarly supports the ALJ's decision to give her opinion little weight. Plaintiff argues that Dr. Lara's opinion reflects total disability; the medical opinion Dr. Lara rendered, however, does not indicate that plaintiff is so disabled that she cannot perform any work. Dr. Lara instead opined that plaintiff either had no problem or a slight problem with regard to the majority of plaintiff's activities of daily living, social interactions and task performance. (Tr. 798-99). The only obvious problems that were noted were in carrying out multi-step instructions and handling frustration. (Id.). Dr. Lara did not indicate that plaintiff had any serious or very serious problems; she also indicated that plaintiff's symptoms were "stable" when on her medication. (Tr. 797). As such, this report does not indicate by itself that plaintiff is incapable of working and the ALJ did not commit

---

[11]In addition to the opinions of Dr. Jonas being inconsistent with the reports of Drs. Diluna and Hughes, as well as plaintiff's own testimony and reporting, they are also at odds with the reports of two non-examining physicians. In August 2010, Dr. Honeychurch and in January 2011, Dr. Khan reviewed plaintiff's medical history and determined that plaintiff was limited in reaching, climbing stairs, balancing, stooping, kneeling, and crouching, among other restrictions. (Tr. 99-101, 111-13). Other than these restrictions, these doctors found that plaintiff was not disabled.

It is within the ALJ's province to discount the opinion of treating physicians and to "permit the opinions of the nonexamining sources to override treating sources' opinions" when they are "supported by evidence in the record." Diaz v. Shalala, 59 F.3d 307, 313, n.5 (2d Cir. 1995), citing Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir. 1993); see also Micheli v. Astrue, 501 F. App'x 26, 29 (2d Cir. 2012)(after considering the opinion of the non-examining state agency physician in conjunction with the medical findings and the inconsistency of the treating source's assessments, the Second Circuit concluded that the "ALJ properly discounted [the treating source's] opinion and the ALJ's determination is supported by substantial evidence.").

an error in not finding the opinion supported a greater level of limitation.

The ALJ further supported her decision with substantial evidence, in that she referenced plaintiff's activities of daily living report and hearing testimony that indicated plaintiff was able to perform a number of chores, attend church, and interact appropriately with family and others. (Tr. 24-26). See Roma, 468 F. App'x at 19. Here, plaintiff agrees that she is able to perform light, non-stressful activities, such as running errands, shopping for food and clothes, cooking, reading, driving to church, and cleaning. (Tr. 231-35). These admissions from the plaintiff undermine both the seriousness of her issues and the weight attached to Dr. Lara's opinion.

Plaintiff's treatment records from June 2010 through September 2011 also reflect that plaintiff's depression was controlled by medication. The record contains numerous instances when plaintiff was noted as having a normal mental health status without depression. (Tr. 508, 510, 514, 516-19, 522, 638, 866, 931, 935, 947). All of this is substantial evidence that the ALJ considered in rendering her decision. (Tr. 26). As previously stated, Dr. Lara opined as to plaintiff's depression and she found only slight problems with working an eight hour day, and similarly, Dr. Brown, a non-examining Agency doctor, concluded that plaintiff had mild difficulties in maintaining social functioning, concentration, persistence, or pace, and no restrictions in activities of daily living. (Tr. 798-99, 110).

B. OTHER ARGUMENTS

1. FACTUAL ERRORS & MISSTATEMENTS

In her brief, plaintiff asserts three areas of error, or misstatements, made by the ALJ in her decision. (Dkt. #19, Brief at 11-18).[12] First, the ALJ did not err in concluding that plaintiff did not

---

[12]Although plaintiff also argues that the ALJ erred by not considering Dr. Jonas a specialist, that alleged error is considered along with plaintiff's other arguments regarding the treating source rule. See Section IV.A. supra.

have a continuous twelve month period of disability following her alleged date of onset, in that the ALJ found that plaintiff's symptoms were relieved following surgery in October 2010. (Tr. 20). This finding is amply supported by substantial evidence in the record. (Tr. 766, 773, 783, 792, 813-14, 928). As such, she was not continuously disabled during this time. Notably, plaintiff's treating sources indicated that the surgery had relieved her pain and that plaintiff had begun to reduce her pain medication during this time. (Tr. 792). Treatment records also note that plaintiff's spinal condition was still under control in January 2011, which indicates that plaintiff was not disabled because of that condition during the relevant time. (Tr. 813-14).

As to plaintiff's knee condition, although there were reports of pain during this time, plaintiff's complaints of pain are subjective in nature and the ALJ is entitled to make credibility findings regarding them. See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). The ALJ found that although plaintiff had knee pain during this time, it was not at a level that would cause total disability. (Tr. 22). This is supported by plaintiff's admissions that during this time she traveled to church and performed household chores. (Tr. 23-26). Further, plaintiff testified before the ALJ that during the time between February and September 2010 she was not using an assistive device to ambulate, but only wore a knee brace. (Tr. 64). She further testified that she began using crutches about five months before the hearing in November 2011 (Tr. 63-64) which means that she was not using crutches during the period of time after her shoulder surgery when her spinal condition had improved. (Id.). Although plaintiff was using a knee brace at this time, the ALJ considered this when reducing plaintiff's RFC. (Tr. 22-27). As such, there is substantial evidence in the record to support the ALJ's finding that plaintiff was not disabled from her knee pain during November and December 2010.

Plaintiff's allegation that she was disabled prior to February 2010 must fail (Dkt. #19, Brief at 14) because she was employed up until February 2010, and therefore must not have been

suffering from a total disability.  Finally, any potential error that the ALJ may have made at step two was harmless, because the ALJ resolved step two in plaintiff's favor.  (Tr. 20).

Plaintiff also alleges that the ALJ erred by characterizing plaintiff's treatments as "conservative."  (Dkt. #19, Brief at 16-17).  However, plaintiff has not indicated how this description was harmful to her in this case.  Plaintiff has not met her burden in establishing an error.  Shinseki v. Sanders, 556 U.S. 396, 409 (2009)("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

### 2. LISTING 1.04A

Plaintiff further argues that she has listed impairments under Listing 1.04A. (Dkt. #19, Brief at 24-28).  In order to satisfy Listing 1.04A, plaintiff must establish the existence of a disorder of the spine: "(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root . . . or the spinal cord[,]" as well as present "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.04 & 1.04A.  Here, the ALJ relied on substantial evidence in determining that plaintiff's condition did not meet or equal  Listing 1.04A, in that the record contains numerous instances where plaintiff's neurological functioning was within normal limits and with full strength.  (Tr. 315, 324, 660-61, 774, 792-93, 823-24).  As the ALJ found, "the medical evidence of record does not demonstrate that she had the significant limited range of motion, muscle spasms, muscle atrophy, motor weakness, sensory loss, or reflex abnormalities associated with intense and disabling pain prior to her date last insured."  (Tr. 25).

36

In addition to plaintiff's treating physicians, the ALJ relied on the opinions of the reviewing physicians who conducted the disability determinations.  (Tr. 20).  These doctors determined that plaintiff's conditions did not meet a listing, to establish that plaintiff was totally disabled. (Tr. 102-03, 115-16).  Based on the record and the opinions of the reviewing consultants it was not error for the ALJ to determine that plaintiff's spinal condition did not meet the requirements of Listing 1.04A.

### 3.  PLAINTIFF'S CREDIBILITY

Plaintiff contends that the ALJ erred in assessing plaintiff's credibility.  (Dkt. #19, Brief at 28-31).  "The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence . . . ."  Marcus, 615 F.2d at 27.   When assessing a claimant's credibility, an ALJ is required to consider (1) medical signs and laboratory findings; (2) the diagnoses, prognoses, and medical opinions provided by the medical sources; and (3) statements and reports from the individual and from treating or examining physicians and psychologists and others about the claimant's medical history, treatment and response, prior work record, efforts to work, daily activities, and other information concerning the claimant's symptoms and how they affect the claimant's ability to work.  Social Security Ruling ["SSR"] 96-7p, 1996 WL 374186 at *5 (S.S.A. July 2, 1996).  "After weighing any existing inconsistencies between the plaintiff's testimony of . . . limitations and the medical evidence, the ALJ may discount the plaintiff's subjective testimony with respect to the degree of impairment."  Romano v. Apfel, No. 99 CIV. 2689 LMM, 2001 WL 199412, at *6 (S.D.N.Y. Feb. 28, 2001)(citations omitted).  As discussed above, the bulk of treatment records, along with plaintiff's reported activities of daily living, are consistent with the ALJ's RFC determination.  Any error the ALJ may have made in failing to mention the specific types of pain that plaintiff claimed to suffer from, however, is harmless in light of the evidence in support of the ALJ's ultimate determination.  See

Jones v. Astrue, No. 10 CV 476(CFD), 2011 WL 322821, at *8 (D. Conn. Jan. 28, 2011)("[O]ne instance of expansively interpreting the plaintiff's responses does not significantly detract from the ALJ's overall credibility analysis[ ]" given that the ALJ "properly cited numerous inconsistencies casting doubt on the plaintiff's credibility.").   Accordingly, this Court defers to the ALJ's credibility assessment.

    4.  STEP FIVE ANALYSIS

    Lastly, plaintiff contends that the ALJ failed to properly determine plaintiff's RFC, and that there are no jobs that plaintiff can perform with "her actual RFC[.]" (Dkt. #19, Brief at 31-36). As discussed above, substantial evidence supports the RFC determination the ALJ reached in determining that the record did not support a finding of disability.  At the hearing, the ALJ asked the vocational expert hypothetical questions based on the plaintiff's RFC.  (Tr. 82-91).  The Second Circuit has held that vocational expert testimony as to existence of jobs constitutes substantial evidence that will satisfy the Commissioner's step five burden of proof, as long as the record contains evidence that supports the hypothetical.  Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983).  The ALJ's hypothetical questions were based on the opinions rendered by Drs. Honeychurch and Khan.  (Tr. 82-91, 102, 115).   As discussed above, these opinions were consistent with the medical evidence of record, and reflected plaintiff's true RFC, as opposed to the opinions of Drs. Jonas and Lara.  See Section IV.A supra.  As the ALJ pointed out, the vocational expert testified that plaintiff would be able to perform unskilled light and sedentary work.  (Tr. 28; see also Tr. 83-91).

    Further, the ALJ specifically rejected the hypothetical offered by plaintiff's attorney, because it was not supported by the record.  (Tr. 29).  The "ALJ [may] properly decline[ ] to include in [her] hypothetical question symptoms and limitations that [she] had reasonably rejected." Priel v. Astrue, 453 F. App'x 84, 87-88 (2d Cir. 2011), citing Dumas, 712 F.2d at 1554.  In this case, the

ALJ's hypothetical question to the vocational expert accurately reflects plaintiff's vocational profile and the ALJ's RFC determination, which determination is supported by substantial evidence.  As such, there was no error in the ALJ relying on the opinion of the vocational expert.

### V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion to Reverse (Dkt. #19) is <u>denied</u>; and defendant's Motion to Affirm (Dkt. #20) is <u>granted</u>.

The parties are free to seek a district judge's review of this recommended ruling.  <u>See</u> 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary of HHS</u>, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 1st day of December, 2014.



   /s/ Joan G. Margolis USMJ   
Joan Glazer Margolis
United States Magistrate Judge